180 F.2d 441
 NATIONAL LABOR RELATIONS BOARD
v.
FLOTILL PRODUCTS, INC. (INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS,
OF AMERICA, AFL, et al. Intervenors.)
 No. 11449.
 United States Court of Appeals Ninth Circuit.
 Feb. 24, 1950.
 
 David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Marcel Mallet-Prevost, Attorney, N.L.R.B., Washington, D.C., for petitioner.
 J. Paul St.Sure, Edward H. Moore, Oakland, Cal., Jefferson E. Peyser, San Francisco, Cal., for respondent.
 Tobriner & Lazarus, San Francisco, Cal., for intervenors.
 Before MATHEWS, HEALY, and POPE, Circuit Judges.
 HEALY, Circuit Judge.
 
 
 1
 This is a proceeding upon petition of the National Labor Relations Board for enforcement of an order issued August 19, 1946 against respondent (hereafter called Flotill).
 
 
 2
 The case represents a segment of the inter-union strife which plagued the California canning and processing industry in the earlier '50's. In 1940 the AFL entered into a Master bargaining agreement with California Processors & Growers, Inc., the dominant trade association in that industry for the California area. Flotill, although not a member of the association, for years followed the practice of subscribing to the Master agreement. The latter contained a preferential hiring but not a closed-shop provision. Flotill from time to time made supplemental contracts with the AFL pertaining to matters not covered by the Master agreement. The latter agreement and Flotill's separate contract were to expire on March 1, 1946. The separate or supplemental contract expiring on that date included a closed-shop provision which appears to have been in force for a period of several years.
 
 
 3
 In July of the year preceding the expiration of these contracts two unions, and Independent and the CIO, filed petitions with the Board alleging that a question had arisen concerning the representation of Flotill's employees within the intendment of Sec. 9(c) of the Act. Like petitions were filed by these unions concerning other processors operating under the Master agreement. Cf. Bercut-Richards Packing Co. et al., 64 NLRB 133. During the period July to the end of September 1945, pursuant to Board orders, there were consolidated hearings on these petitions in which the various employers, including Flotill, were represented. On October 5, 1945, the Board directed an election in the consolidated cases, finding that the existing contracts with the AFL did not constitute a bar to the representation proceedings because the contracts were to expire within a short time and the remaining period thereof was one in which canning operations would be at a low ebb. Shortly thereafter the regional director of the Board conducted an election among Flotill's employees in the unit found to be appropriate. At this election there were 105 votes for the AFL and 100 for the CIO. In addition, there were 20 challenged ballots.
 
 
 4
 The AFL interposed objections to all the elections held. On February 15, 1946, after a hearing on the objections, the Board vacated and set aside all the elections, included the Flotill election, on the ground that their results were inconclusive, stating that new elections would be held as early in the 1946 season as there was substantial employment. It said: 'While we view the record as requiring this result, we reach it with considerable reluctance because it means that the employees will have no bargaining representative to negotiate an exclusive collective agreement to cover the coming season, until a new election can be held which may result in one of the rival unions being certified. The current AFL contract will expire on March 1 and since the legal effect of the foregoing determination is to keep the question of representation pending before the Board, none of the unions is entitled to an exclusive status as the bargaining agent after that date. In accordance with well-established principles, the employers may not, pending a new election, give preferential treatment to any of the labor organizations involved, although they may recognize each one as a representative of its members. In this state of the record no legal effect may be given the closed-shop provision contained in the current collective agreements after their expiration date; the inclusion of any such provision in any new agreements, or action pursuant thereto, would clearly be contrary to the proviso in subsection 8(3) (29 U.S.C.A. § 158(3)). Nothing in our decision, however, should be construed as requiring any change in the substantive conditions now existing by virtue of the foregoing agreements.'
 
 
 5
 Flotill, although aware of the Board's ruling, on March 5, 1946 entered into a contract of indefinite duration with the AFL, continuing the existing closed-shop arrangement and the recognition of that union as the exclusive bargaining representative of all the employees in the appropriate unit. Employees were required to become and remain members of the AFL on penalty of discharge. Flotill thereafter gave effect to this agreement.
 
 
 6
 On the basis of the foregoing facts the Board found that Flotill, by its grant of exclusive recognition and a closed shop to the AFL had interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed them by Sec. 7 of the Act, 29 U.S.C.A. § 157, in violation of Sec. 8(1) thereof. It ordered Flotill to cease and desist from these unfair practices, to cease giving effect to the closed-shop contract, to withhold exclusive recognition from the AFL unless and until that union shall have been certified by the Board as the exclusive representative of the employees, and to post appropriate notices. The philosophy of the finding and order, as indicated by the Board, was that Flotill, by recognizing the AFL as exclusive representative at a time when its representative status was in doubt and its contest with the CIO for certification as bargaining agent was unresolved, had granted potent assistance to the AFL in derogation of the right of the employees to vote without restraint in the forthcoming election; also, that by conferring upon the AFL the advantage of a closed shop, Flotill rendered 'well-nigh impossible' full freedom of later choice by the employees. The determination in this respect had its genesis in the rule announced by the Board in the Midwest Piping & Supply Company case, 63 NLRB 1060, referred to in the briefs as the 'Midwest Piping' doctrine.
 
 
 7
 The Board's petition for a decree enforcing its order was filed in this court in October 1946 but was not brought on for hearing until 1949. Meanwhile the situation existing at the time the order was made appears to have altered materially. The facts concerning subsequent developments are before us, partly in the form of stipulations and in part by concession of the representatives of the Board. In 1947 Flotill moved for leave to adduce as additional evidence the results on an election conducted at its plant on August 31, 1946. The court, in effect, granted the motion, reserving judgment as to the materiality of the evidence until its consideration of the case on the merits; and the facts concerning the outcome of the contest were stipulated. The stipulation includes a tally of votes at the election then held under Board auspices. The tally shows 535 votes cast for AFL and 358 for CIO, with 16 votes cast against any labor organization participation. The Board informs us that upon objections filed by CIO there was an extensive investigation of the conduct of this and other elections, the investigation here not being completed until the latter part of August 1947. A motion or motions to dismiss the entire representation proceeding followed; and on January 20, 1948, the Board issued an order dismissing the petitions for investigation and certification of representatives on the ground that the CIO had not complied with the reporting and filing requirements of Sec. 9(f), (g), and (h), of the Act, as amended, 29 U.S.C.A. § 159 (f-h). A copy of the order is included as an appendix to the Board's brief and is shown on the margin.[1]
 
 
 8
 The Board contends that events subsequent to the date of its order may not be considered on review, and that in any event the facts related above are immaterial to a decision. The court's sole province, we are told, is to determine whether the order was valid when made and, if so, to decree its enforcement. This may be assumed to be a correct statement of the law as a general proposition, but whether it is true in the extraordinary circumstances here developed is another problem and one we are obliged initially to decide.
 
 
 9
 The Board's order, if valid at all, was made so only by the pendency of the representation proceeding. Ignoring for the moment the pendency of that proceeding, there is no ground upon which Flotill's conduct in negotiating and giving effect to the contract with this national union can be thought tainted with unfairness or illegality. As seen, it had for years dealt with the AFL as the exclusive bargaining representative of its employees, and long prior to 1946 had granted it the closed shop. It was confronted with no evidence demonstrating that the union had lost its majority status; certainly the election of the preceding October, if it proved anything, had indicated the contrary. The Act contemplates the making of contracts of this character with labor organizations. That, indeed, as was said in Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126, is 'the manifest objective in providing for collective bargaining.' And ct. Colgate-Palmolive-Peet Co. v. N.L.R.B., 338 U.S. 355, 70 S.Ct. 166. In short, Flotill's right, to say nothing of its legal duty, to continue to bargain with the AFL in the same manner as it had done in the past was on this record manifestly unassailable, save as it may have been rendered vulnerable by the fact that an election had been ordered and was shortly to be held under Board auspices.
 
 
 10
 As of the present no representation proceeding is either pending or in prospect. The Board insists, nevertheless, that the affirmative action it has directed the employer to take, namely to cease giving effect to the exclusive bargaining and closed-shop relationship unless and until the union is certified, is such action as will effectuate the policy of the law. While it is the task of the Board, not of the court, to determine matters of administrative policy, the court is obliged to consider the effect of its own action in situations that appear to it to entail a proposed subversion, rather than an effectuation, of the legislative purpose. It has many times been said that the fundamental purposes of the Act are to protect commerce from interruptions brought about by strife between employers and workers, and to stabilize labor relations by promoting the principle and practice of collective bargaining. Consolidated Edison Co. v. N.L.R.B., supra; Colgate-Palmolive-Peet Co. N.L.R.B., supra. As this case now stands, and has stood for the past two years, enforcement of the Board's order would in our considered judgment tend directly to thwart those purposes. The power granted the Board to direct affirmative action is remedial, not punitive; and the remedial effect of disciplining the employer would at this juncture be slight as compared with the harm certain to follow upon an enforced disruption of the legitimate and long-subsisting relationship between Flotill and this union.
 
 
 11
 The Board itself recognizes that the indiscriminate application of the so-called Midwest Piping doctrine 'can easily operate in derogation of the practice of continuous collective bargaining.' Matter of Ensher, Alexander & Barsoon, Inc., 74 N.L.R.B. 1443, 1445. The doctrine is certainly disruptive of the practice where, as here, representation proceedings are retained before the Board for inordinate lengths of time. Where such a proceeding is at long last dismissed, as it was here, for reasons having nothing to do with the employer's failure to heed the Board's admonition to discontinue the normal process of collective bargaining, the dismissal should, at least in a situation like the present, be taken as rendering nugatory the order for an election and as a restoration of the status quo.
 
 
 12
 For these reasons we are constrained to set aside the Board's order in its entirety and to dismiss its petition.
 
 
 
 [1]
 'It is hereby ordered that the petitions for investigation and certification of representatives filed by the Petitioner with respect to employees of California Processors and Growers Inc., and the independent companies involved herein, wherein no certification issued before August 22, 1947, be and they hereby are dismissed
 'By order of the Board:
 'Signed at Washington, D.C., this 20th day of January, 1948.